40459 Hinojosa v. Livingston. We'll hear from Mr. Anastasiadis. Good morning Judge Jones, Judge Elrod, and Judge Rievele. And thank you for pronouncing my name correctly, Your Honor. It doesn't always happen that way. On behalf of my clients, William Stephens, Rick Thaler, and Brad Livingston, I would like to thank the Court for affording us the privilege of presenting oral argument today. And on behalf of the Attorney General's Office, I'd also like to thank the Court in advance for the careful attention to detail we know this Court will give before it issues any opinion. Your Honor, I read an investment guide once that stated that one way to succeed was to find an enterprise whose basic premise was false and bet against it. Not surprisingly, this theory applies to court cases generally, and it applies specifically to this case. The false premise on which this lawsuit against my clients rests can be found in the record in the very complaint that is the vehicle for bringing this lawsuit. There are three areas in the complaint, starting on page 34, ending on page 41, that demonstrate the false premise. Before I get to it, I have to premise. I have to lay the foundation so this Court understands why this premise is false by telling the Court what I think this lawsuit is about. And I will tell this Court what this lawsuit is about, not in my words, but in the complaint's words. Let's first look at page 35 of the complaint, which states, and this is a direct quote from the complaint, Hinojosa's argument is not that air conditioning is required for all prisoners, but that prisoners with heat-sensitive medical conditions who are at heightened risk of stroke and or death must be provided adequate protection. That's the complaint. Second quote, Hinojosa does not, and this is at page 41 of the complaint, Hinojosa does not allege that the TDCJ defendants knew Hinojosa and were directly aware of his specific situation. And finally, the third quote that contains the false premise can also be found on page 34, and this is, quote, the defendant, the TDCJ defendants knew that no medical provider would even see Hinojosa until after he had spent his days in the dangerously high temperatures. Let me explain to the court why that premise is false. Basically, they say, oh, I'm sorry, there's one more quote related to that, Your Honor, that I missed. Specifically, this is, again, the complaint, page 34. Specifically, Hinojosa alleges that the TDCJ defendants knew that Hinojosa and inmates arriving at TDCJ facilities would not undergo a physical for up to 10 days after their arrival, unquote. This is, in the plainest words, what their complaint's about. Framed as an issue, the court can probably understand it maybe more clearly. Here's how I frame those quotations as an issue, and these are my words. I'm no longer quoting from the complaint. I say the issue before this court is, does clearly established law require the top three prison security administrators who have no medical qualifications or medical responsibilities to have a policy requiring that each inmate arriving in a prison unit must be immediately given a diagnostic medical physical prior to assigning him housing? Put another way, did Albert Hinojosa, on August 27th of 2012, have a constitutional right to a pre-admission physical before he was assigned to a prison dormitory at the Garza West Unit? Now, the reason the premise is false is because of a case cited by an attorney in the previous argument, and that's Smith v. Sullivan. And I'll quote for that case. It's a Fifth Circuit 1977 case at page 380. Quote, we do not think it necessary to require that all incoming prisoners be given a medical examination within 36 hours of incarceration in the absence of reasonable grounds to suspect that an inmate requires such an examination to protect himself or others. Smith v. Sullivan cites Estelle v. Gamble, and it's also cited by this court in its opinion in Blackman v. Garza case, which not only the appellants and the police cite, but even the amicus brief cites. That's reason number one why that premise is false. Reason number two that premise is false is that the complaint contradicts the claim that the TDCJ defendants knew no medical prisoner would even see Hinojosa after he had spent several days at the Garza Unit because it admits that at the Garza West Unit it was medically staffed, that that staff, medical staff, was available to respond to inmate medical needs and sick call requests every day from 9 a.m. to 6 p.m. for each of the several days that on paragraph 57 of the complaint they say he was there. This court can also take judicial notice, as we have invited it to do on page 4 of our brief, that the Garza West Unit has 57 medical staff assigned to it. Excuse me, 47 medical staff, 42 medical and five mental health professionals, and we cite that in the brief. Several days. I'm trying to figure out is this your argument that the complaint should have been dismissed or is this your argument that the discovery is improper? I have not. That's all of that. Thank you for asking that clarification, Your Honor. I have not reached the discovery issue. This is an argument for why the complaint in this case does not defeat the qualified immunity of the defendants. And we are asking for clarification purposes, I say we are asking this court to reverse and remand with instructions to dismiss this complaint against Thaler, Stevens, and Livingston. Is there any case that you are aware of that has ever held that individual, the top three officials at a gigantic prison system like that of Texas can be held individually liable in damages? No, Your Honor. For conduct that they did not personally engage in? No, Your Honor. The only time the top-level administrative staff will be called, hailed into court to answer is when injunctive relief is sought and it is their services are needed so the court can enter injunctive relief. As far as personal liability with a qualified immunity standard, I do not know of any case that has said a TUCDA director is supposed to provide water, make housing assignments, or take into consideration an inmate's personal medical needs. Now, I say to this court that you cannot make a plausible allegation that an inmate will not be seen for 10 days, up to 10 days after his arrival when you also allege that medical staff is available to attend to his needs 9 to 6 p.m. and you also acknowledge that after 6 p.m. there is available the local hospital system and local emergency room system that prison units use when they do not have 24-7 care. And that's why I say, those are some of the reasons why I say that premise is false. Not providing an inmate intake physical is not the same or equivalent as denying medical treatment. I submit to the court that it doesn't matter, Your Honor, whether they knew a particular inmate had a medical issue or whether inmates as a rule had a medical issue. If they have a medical system in place that is designed by law to deal with those issues, there's no constitutional requirement that I'm aware of that requires a security administrator with no medical qualifications to look behind what doctors assess, fail to do or do, and say, I don't think that's right. We need to handle things differently than what our medical staff is doing. Isn't this the classic situation where you have to distinguish between medical negligence and deliberate indifference? Very well put, Your Honor. This is a classic case where an allegation of perhaps medical deficiency is sought to be attributed to the very highest level of a prison system that contains 153,000 inmates, 40,000 officers and 111 units throughout a large state in Texas. The largest population, as we pointed out in our brief, in the United States. And isn't it also correct that the complaint states that 10% of those inmates are at risk for heat illness because of conditions like heart problems, diabetes, obesity or mental illness with psychotropic drugs? 10%? The complaint, I don't recall the exact percentage, but the complaint does allege that there are a number of people within the system that can be reasonably believed to have a medical deficiency. Let's say it takes 10%. The question I would have is, the complaint refers to 10 or 11 fellows having passed out and died during our recent drought and heat problems out of a potential population of over 15,000 who could have been at that risk, which suggests to me that what you're talking about is individual medical conditions rather than systemic deficiencies in the system. That's exactly what's been the whole problem with this case, Your Honor. They allege one inmate in this particular case, but at every juncture, the argument seems to be, let's look at what's happening to other inmates and other units and their situations. And we suggest to the court, to the extent that the plaintiffs attempt to conflate the plight of other inmates, other than Mr. Hinojosa, they are not supporting their case because this isn't about a class action involving the entire TDCJ system. It involves one specific inmate with a particular set of medical needs that allegedly were not met. I'm wondering, the cooling measure for the pigs that was allegedly approved, was that in a different unit? Did the pigs need to be protected from the heat? It says that Livingston did not take steps to protect prisoners from extreme temperatures, even though he approved cooling measures for pigs. Is that a different unit, or is that this unit? The complaint does not make clear what unit it was, but I would suggest to the court it doesn't matter because that's not a valid comparison. They also allege, for example, the armory was cooled. Why is it not a valid comparison to say you need to protect pigs if they might get heat, if they might die in the heat? Because you're raising baby pigs, but pigs aren't people. Here's why I don't think it's a valid comparison. As attractive an emotional argument as attractive as that might be, the basic facts of this case involve who has responsibility for medical care and who has responsibility for other issues. So Livingston had a responsibility to protect the livestock, but not to protect the inmates from heat stroke. That's the position? Yes, Your Honor. There's no UTMB system that's designed to protect pigs. If there was a UTMB system designed and monitored to protect pigs, then it would be that system that would be making the authorization for those pigs to be protected. Under the system as it works now, and now, again, I'll quote from the complaint, which they admit that it's not the TDCJ security staff that has the responsibility for medical needs. Here's what they say in their own complaint. UTMB makes, I'm not, not page 42, paragraph 42 of the complaint. Quote, UTMB makes mandatory housing recommendations for some prisoners with disability. It doesn't say TDCJ or Mr. Livingston does. It says UTMB makes those decisions. Paragraph 89 says Dr. Murray and UTMB continue to house vulnerable inmates in hot temperatures knowing that some areas of those units had air conditioned spaces available. Okay, so it's your position that Livingston, Thaler, and Keating do not provide any supervisory authority over Dr. Murray and UTMB. So therefore, UTMB makes those decisions for any of the offices of UTMB and they can't be liable. Is that basically the? Yes, Your Honor. That's why this claim fails? Yes, Your Honor, and that's supported by a case cited in our brief at page 11, footnote 21, Wilson versus McGinnis, and also by Texas statutes. Back in 1999, 13 years before Mr. Hinojosa was locked up, the Texas legislature removed all supervisory responsibility over the medical system from the TDCJ officials and transferred it to a committee of managed health care consisting of nine members appointed by the governor, seven of which were required to be medical doctors licensed in Texas or otherwise medical professionals. So we say if any consideration needs to be given as to medical history, psychotropic drugs, inmate needs for an environment that's cooler than other inmates, those decisions are not made at the security administrator level because it would violate common sense to have a non-medical person make a decision of what an inmate's medical needs is. Therefore, it's irrelevant whether they have personal knowledge of the situation. There's no discovery that's necessary to determine whether they actually have personal knowledge. Even if they have personal knowledge, they don't have supervisory responsibility. That's your position? Exactly, Your Honor. And Texas Government Code 501.139 specifically states policymaking authority as to medical needs of inmates in a prison system are the responsibility of this nine-member committee, not at any one of the TDCJ. The court didn't mention that in her order, did she? No, Your Honor. The legal assignment of responsibility. No, she did not. Well, let me give you five more minutes because we need to talk about discovery a little bit. Yes. Do you have a question? Well, I was about to say the problem is that the complaint at some detail talks about these defendants having full knowledge of this danger, and all the court has done is say and emphasize very careful restriction on discovery simply to see whether or not that allegation can be supported as a fact issue. That's all. That's all we're here for. Unfortunately, the district court went far beyond that, Your Honor. They did not restrict yourself, even if it was relevant. The district court did deny 12B-6 dismissal, didn't it? It did deny it, Your Honor. That's all right. This is what I was confused about, though. It seemed to me she said it didn't rule on it. She said, I can't rule on it without further discovery. Was that on the sufficiency of the complaint? Yes, Your Honor. She did use the DACI language, but at the very same time that she did that, she also said she found the complaint to state sufficient facts to defuse immunity. So which one of those? You can't have it both ways. Does the complaint state sufficient facts, then we need more discovery, or does the complaint not state sufficient facts? Right, because I wrote BACI. I know what BACI says, and that's why I was confused because for the complaint to be sufficient is one thing, and you're arguing it is not sufficient because there is no law that imposes supervisory constitutional liability, as Iqbal said. Exactly. On the other hand, if a court orders discovery, it is because one side said because the court has denied discovery, I mean, sorry, denied qualified immunity, and then discovery is limited to the question of immunity, she's denied dismissal to preserve the issues whereupon the parties will file cross motions for summary judgment. Right? Is that what she was intending for you to do, to undergo discovery and then file a motion for summary judgment? That appears to be her intent, Your Honor. It wasn't clear to me at all from her language. Well, her language was confusing because it was inconsistent because she both said that she needs additional discovery to make a determination, but then she went ahead and made a determination on immunity by denying the motion. Given the fact that there are numerous other, like eight or nine other cases pending at the trial court level, many of them with the same plaintiff lawyer, presumably you're defending a bunch of them, why did anyone press the district court on streamlining discovery or tailoring it to each individual case? In fact, I filed a motion for protective order asking the court to do exactly that, Your Honor. That motion was denied and the court went ahead and entered discovery not only on the issues in this case, but even went to issues as to whether inmates should be transported in a cooler environment in a bus system during transport, which is not even an issue in this case, let alone that it allowed discovery for all 111 units and what was happening on those units in addition to what was happening at the Garza West unit. To me, that exceeds the permissible scope that's given us in this case. Right. So we would argue this court has jurisdiction not only because the discovery was expansive and wasn't tailored to the immunity issue, but because of the basic flaw in the district court's reasoning, which as Judge Elrod pointed out, the complaint simply does not overcome immunity because it alleges that people who don't have responsibility over medical ought to be making medically based decisions as to what inmate has a need and where they're supposed to go based on that medical need. Did the district court just inadvertently use the word transport when they mean transfer facility? And so it's not really about transportation of prisoners and the mechanisms you transported. It's about transfer facility, and that's what the discovery is a subject of this lawsuit. If the court wanted to indulge, if this court wanted to indulge the district court and make the assumption that it meant that, I can see the court doing that. We didn't read it that way. But if we were to read it that way, we would again fall back on the issue that even if the court meant transferring, security administrators are responsible for safety risks to inmates based on violence as to other inmates, not for medical issues. They can sure transfer an inmate if he's being threatened because they have security expertise as to whether an inmate should be protected from violence. They have no such expertise on medical issues. So when you talk about transferring a result as of a medical need, you get to the 511.149, which says those type of decisions are made by policy, by people trained and qualified to make those decisions. And it looks like my time is up, Your Honor, unless you have any more questions. That's all I have to say. Okay, thank you. Okay, we're hearing next from Mr. Edwards. Thank you, Your Honors. Just so that the record is crystal clear as to what Judge Ramos did, if you'll check out the record on appeal at 459 in the final footnote, this court finds that under the first step of BACI, denial of defendant's Rule 12b6 motion is appropriate, which does not give the defendant's license to seek an immediate appeal. Judge Ramos followed your BACI decision to the letter, Your Honor. To the letter, she assessed the complaint for factual sufficiency, found that there was in fact a validly stated claim for the deliberate indifference of the three senior Texas prison administrators because they knew, because they actually knew that the people like Mr. Hinojosa were in danger of a substantial risk, not a cough or a cold death. Mr. Hinojosa was the 12th person to die from heat stroke because of a dangerous condition in the Texas prison system that these three administrators knew about, knew about and disregarded. Mr. Hinojosa is the poster child for the person at risk. He had diabetes. He was obese. He had hypertension. He was a schizophrenic. He was just under 60 years old. Excuse me, sir. How obese was he? Above the index for mortality, which would be... Are you obese? You know what? I don't know, but I very well may be, Your Honor. I very well may be, and that's a very significant question because as a factual matter, if I am obese, if my body mass index is above a 35, and it very well could be. I'm not as young as I used to be. That's for sure. If I am, I am at risk in the Texas prison system because of the temperatures. Well, let me ask you a question. Sure. Wouldn't it be easier for you to sue people over obesity and then require the Texas prison system to give everybody a low-cal, low-fat diet? I don't know if it would be easier for me to sue the Texas prison system about a low-cal, low-carb diet. I'm not in prison yet. And that lowers hypertension, too. It very well may be, but that's a little late for Mr. Anahosa, who's dead. I guess my point is not to be flippant about this situation. I'm very sorry about it. But to say that you're trying to say that the prison officials should be held personally liable in damages when, to my knowledge, no other top prison officials have ever been held personally liable. But why does that even—why is that a legitimate question, Your Honor? Well, in every case where somebody dies of a medical problem, the issue that's posed to us is was there medical negligence or was there medical deliberate indifference to that person given the knowledge of that person's condition? And you don't—we have no—clearly you wouldn't disagree that these top officials knew nothing about Mr. Anahosa's condition. Well, but that's a really important point, Your Honor. No, of course not. I'm not saying that Brad Livingston, who manages a 100,000-plus prison population, knew Mr. Anahosa personally. But the suggestion that that's even relevant is preposterous. He said it didn't matter today. In his brief, he said it mattered. But, I mean, you and I, as non-medical people—we are lawyers after all— can't tell the relative risk to people even if they do have a heart— your pleading says 10 percent of the inmates have these problems. And epidemiologically, I would suggest that if you have 11 deaths, tragic though they are, among potentially 15,000 patients, people at risk, that that's a very tiny percentage. Now, with respect, Justice, I take it that we are both lawyers and we're not epidemiologists, but to suggest that—and this is why— There's the flaw in your argument. This is the flaw in your argument. Heat stroke is completely preventable. Completely preventable with a simple housing restriction. None of these deaths had to happen, and housing is controlled by the administrators. Then 10 percent of the inmates of the Texas prison system are entitled to air conditioning or better facilities. That's not this case. You pled that it's 10 percent as part of your pleading that these officials have knowledge of a particular systemic risk. I believe the exact pleading was upwards of 10 percent have— Upwards. Have conditions which place them at risk of substantial harm according to TDCJ's internal policies. What that means is that, let's say, 15,000 people are at risk when the heat gets into the 90s, 100s, 110, 120 degrees. Your pleading also says that there was water available. Your pleading says—what else? That there were—I think that they could— Well, clearly they could have wet down their clothes or something. I believe it said—did it say something about fans in this Garza West unit? With respect, we must be reading a different pleading because— You're going to accuse me of misrepresenting, okay? Well, I'm not— Well, you corrected my argument a minute ago. I did because the pleadings in this case suggest that Mr. Inajosa did not have adequate access to water because he could not get a cup. He did not have access to cold water, which is what gates would require. He did not have access to a personal fan. So even under gates— He did have a sink, right? I don't know if he had a sink, frankly. It's not part of the pleadings, though. Counsel, can you help me with a problem? Sure. Can you help me with the argument raised by opposing counsel that it doesn't matter whether or not he— because these are not the responsible people for making sure that it's not separate. It's all on the doctor staff, and that the administrative staff have no responsibility for making sure people don't die in this. Can you help me with that? Sure. First of all, whether or not UTMB bears any responsibility for medical decisions at the unit is a separate and distinct part from whether or not an administrator of a housing system has to provide safe housing. And not to regurgitate Hornbook law, but that is the criteria. Shelter, the most basic thing. Once you take away somebody's liberty and they do not have the ability to go on their— With due respect, sir, you're making a jury argument. She asked you a precise question. If there is a law that says that there is a medical board responsible for health care in the prison, why doesn't that law assign the responsibility and therefore the potential liability? There is not a law which assigns medical care to another board. There are joint policies that are made by TDCJ and UTMB that co-manage the housing units in the prison. So does the administrative, the head of the TDCJ, retain responsibility for the housing decisions? They don't have to defer to UT. Yes. Is that a play? Yes. It is played that they have the responsibility for housing decisions, that they have the ability to place people in housing, and they have formulated policies that have specific heat-related policies for work but have chosen not to do that for housing, despite the fact that it is— So not the medical staff, but the actual administrative staff has formulated heat-related policies related to work. Yes, they have absolutely formulated that, and it is a great distortion of the facts to suggest that UTMB, which may also have responsibility in this case, depending on the factual circumstances, there is a limited amount of air-conditioned beds or cells available for the medical department to say, this is where we'd like to go. It's pled in this case—I'm sorry, I just need to be careful. It's pled in this case that they retain that responsibility, and perhaps—is it alluded in this case that they retain for the work? Yes, it is absolutely— And that's absolutely true that they maintain, or is that pled? It is pled that they maintain responsibility for housing decisions and the conditions in the Garza West unit. It is certainly pled there. There has been subsequently an amended pleading, which delves into much more of the factual detail. Let me ask you, how does your complaint satisfy Iqbal? In terms of supervisory liability or in terms of conclusory allegations? Both. Well, we would suggest that Iqbal requires there to be a plausible basis, a plausible factual basis for the claim. What we've said here is that the prison officials have a responsibility to monitor and control the housing areas. They knew that 11 people had died, and they knew that there was a danger here. We've pled that through knowledge of their deaths, through knowledge of policies, through their own internal policies, through descriptions of internal meetings that they had. Well, now wait. I mean internal meetings is pretty conclusory. Well, in the record that my opposing counsel attached, there is a deposition from one of the prison administrators. We're talking about the complaint. We're talking about the—assuming we have jurisdiction, which I believe we do, but my colleagues may not, the sufficiency of the complaint has to stand on its own. Well, assuming that there is jurisdiction to judge the complaint, yes. I mean, we would suggest that the factual matter that Judge Ramos found does, in fact, satisfy the law under Iqbal. With regard to supervisory liability—well, I'm sorry. With regard to specific in terms of do they have a supervisory responsibility, we would say they absolutely do, and we've pled that they do as the top—the senior three most. They're the three people who are responsible for making sure that the policies are enacted. They're the ones who have the ability and made a decision not to make these areas climate controlled. What do you do with all these cases that we have where the sheriff of the county is sued because an inmate dies, and quite often it's inmate suicide, occasionally it's inmate violence, and our cases routinely hold the sheriff as the supervisory authority, but he had no personal knowledge? What distinguishes those cases, that episodic case versus the condition of confinement case in a prison setting, is here there is a policy that they have made to not mechanically lower the temperature in a prison. They have made policies to specific—and when I say they, I mean the three people that we're talking about who are directly involved. But again, ultimately the question is the difference between medical negligence and deliberate indifference. Based on the pleadings, Mr. Hinojosa was not seen by a medical person. There is no medical negligence claim here. This is a person who came from a, by law, county air-conditioned jail, had medical conditions which rendered him vulnerable, which TDCJ, through the three people that we've sued, provides policies geared towards protecting those people, and he died within a day based on placement in a transfer facility that was dangerous for him. So the main claims are not that it was deliberate indifference to a serious medical need, and there are some claims about that, but the main claims are that there was error in the housing assignment. Absolutely. It's not a medical decision that was or was not made appropriately. It's a housing decision. Absolutely. That's the difference between your case, is what you're saying. Yes, Judge Elroth, yes. With regard to BACI, it would be our position that there is not jurisdiction over this particular appeal because Judge Ramos made the appropriate factual findings and then issued a, and then chose to defer finding of whether or not to apply qualified immunity and narrowly issued a discovery order. What's narrow about it? What's narrow about it is that each of the categories. How have you deposed these gentlemen before? Well, I deposed them in a different case. How many cases? Ten cases? How many times have you deposed them? I've deposed two of the three gentlemen one time in a different case. But it's all the same issues, isn't it? It's always the same issue, housing, right? They are the same issues. You're right. They absolutely are the same issues. Yeah, and three or four of those cases are on appeal to us now. Three or four of them are on appeal, not the one where the deposition took place. And my issue with that, had there been kind of an agreement amongst counsel that this was going to be the deposition for all the cases, that's one thing. But those cases were operating under different tracks, with different ideas. Those were voluntarily produced. They're not even defendants in that particular case. Did Judge Snyder have most of those? Where are these cases pending? Well, they're all currently pending before Judge Ellison currently because the parties have agreed to a transfer of all of them. From the Eastern District? Yes. All of the cases are now currently pending in the Southern District before Judge Ellison. Judge Ellison also dealt with this same issue in a case called Martone. That is also one of the orders that we provided. He also agreed with Judge Ramos and Judge Snyder. Each have issued what we would describe as narrowly tailored discovery orders that go to the heart of deliberate indifference. I was just wondering why, if all the judges are agreeing on what the discovery is, then they're all agreeing that there's potential, that thousands of documents are relevant to this query. It just seems to me if your issue is housing several inmates, your case is simple. That's what you'd tell the jury. Twelve inmates died. The top three fellows knew about it. They didn't do anything about it. Right? That would be a theme that I would develop in the case. Yeah, so how much discovery do you need to tie down that information? Well, if they stipulate that they knew about each death and they tell me when they knew about each death and they tell me what they knew about the dangers associated with transfer facilities and people acclimating, and they stipulate to all the things that are in our complaint, I suppose you're right. We wouldn't need any discovery. But as you said earlier, the depositions that you've taken were not defendant depositions of their personal knowledge of our case vulnerability. No, they were not. It's just such a matter of this little discovery, right? Absolutely, and they were before an order came down in another court relating to the provision of a lot of electronic discovery. I think that's a little bit beyond the scope of this particular appeal. Well, it just seems to me there was some way to tailor discovery rather than, you know, these were ten categories so we're calling for thousands and thousands of documents. And I suspect that if this, I mean, you know, had the Iqbal case come out the other way, it was a 5-4 decision, and that's what would have been required to show that Donald Rumsfeld knew that Muslims were being rounded up and put in maximum security following September 11 and allegedly subjected to harsh treatment. Why didn't you sue the top guys instead of the medical guys? You sued the warden, the supervisor, Ms. Green, I think her name was. But why didn't you sue the immediate people who were responsible for that prison unit? We sued the correctional officers who were responsible for making sure that remedial measures are taken. We sued Dr. Murray, who is the head of the University of Texas Medical Branch System, in this case. He did not move for qualified immunity. I understand. And so are you asking me why we didn't sue some person that he did not see at the unit? He didn't see any medical people at the unit. He didn't even talk to anyone at the unit. Based on our pleadings, there's nothing in our pleadings to suggest that he saw people at the medical unit. He certainly didn't see a doctor, and one of the issues is the need for an inmate physical, the need for a doctor to check people out to determine, hey, are you at risk? What do we need to do for you? That didn't happen yet. Well, and then suppose that Livingston, Thaler, and whoever they are, are non-medical supervisors for the whole system, are relying on UTMB, and UTMB says there are 47 medical staff at Garza West, and UTMB says that, you know, I don't know if they have criteria for when these I don't know if the patient walks his own record. Inmate walks his own records, has a dog tag, has information from the county. You know, I don't know anything about how that occurs, but clearly there are systems in place with 47 medical staff and 2,200 inmates. That's a pretty good ratio, and therefore why doesn't this boil down to a question of negligence rather than deliberate indifference? You threw a lot out at me, and I'm out of time. May I respond to those questions? Sure. Okay. Whether there's 47 employees technically at the Garza West unit is not the issue here. The issue is was there medical care provided to Mr. Hinojosa at all, and who's responsible for making sure that happens? And here the administrators are able to if Mr. Hinojosa can't see a medical provider, there's a housing decision to be made, and that housing decision is made by the administrators, and they can decide to house him in a safe environment because they do know that he is vulnerable. And these are not medical documents. These are just categories of information where you place people in based on risk. But how could you say they knew he was vulnerable if he never saw a medical person? Well, I'm not saying they personally knew. Well, I'm just asking. Okay. I'm not saying that they personally knew Mr. Hinojosa. What I'm saying is they personally knew there were people like Mr. Hinojosa because they get updates about people like Mr. Hinojosa and because they learned over the course of time that people just like Mr. Hinojosa were the ones that were dying or suffering heat exhaustion. And so perhaps I'm overvaluing that, but the person who had the ability to fix the problem are the senior people, and it's evidenced best by the fact that pigs get misting and get cooling by policy because of the administrators, and people do not. And those are administrative decisions made by TDCJ, made by Director Livingston, Director Stevens, and Director Thaler. Thank you very much for your time. So let me just say that I think Judge Ramos fully understands the protection of state officers and not putting them through extensive discovery or trial. If you sought 50 depositions and 1,000 documents, what do you think Judge Ramos would do to you? I think Judge Ramos or Judge Ellison would tell me that's too much. How many thousands? Wait a minute. How many thousands did you ask for? Of documents or depositions? Documents. We asked for documents that were relevant to our claims, and what makes that a complex issue? Just answer my question. Thousands of documents, right? There are thousands of documents, but what's very significant... No, that's all I asked. Judge Reveley said, what would Judge Ramos... At this stage, are those all satisfactory to Judge Ramos' restriction? Maybe so. Yes, and it's complicated because these cases are progressing on a track where this is not the only case, and the parties are engaged in streamlining discovery, and there are claims in this case which don't rely on the issue of qualified immunity and go to discrimination. So discovery is going to come forward on that as well, so it's hard to say. But with regards to just the issue of qualified immunity, Judge Ellison, Judge Schneider, and Judge Ramos all made it clear we're going to limit it to documents or depositions which relate to these individuals' personal knowledge of the dangers and what they did about it, when they knew about problems, and what they wanted to do about it in order to solve them. So you could assess, are they negligent or were they indifferent and purposely so? Thank you, sir. Thank you. Mr. Anastasiades. Thank you, Your Honor. I've heard a couple of things that I want to take great exception to from Mr. Edwards. He wants to tell this Court that he's pled that the responsibility for making housing decisions is also on TDCJ staff. That's a half-truth. As I've already pointed out, housing decisions, to the extent they involve security of the inmates and threatened violence, which is the expertise of security administrators, sure they have housing authority over that. But let me just read to you his own complaint, paragraph 43, page 39 of the complaint, and you decide who he's alleging has this responsibility. This is a direct quote. Dr. Murray and the practices for which he is responsible, including not placing housing restrictions on inmates vulnerable to the heat. That's his own complaint. Not providing intake physicals for inmates when they first arrive. I'm sorry, I'm listening. What's contradictory about that? That he didn't give his input and they didn't have a system that provided. I don't see what's inconsistent about that. I'm not saying these are true things that they've pled, but I don't understand what's inconsistent about that. Because it talks about intake physicals and providing medical care to inmates, which it's traditionally a medical responsibility which security people have no expertise to make assessments with. To attribute expertise to non-medical people as to whether an inmate has a medical need that requires specified housing not only contradicts his own complaint, it also contradicts 501.146 of the Texas government code, which states the committee, the managed health committee, shall develop and approve a managed health care plan for all persons confined by the department that specifies the types and general level of care to be provided to persons confined. The prisons that Texas has in some of its prisons, are those promulgated by the medical staff or are those promulgated by the TTCJ? What I read to you is the state law, Your Honor. The state law gives those responsibilities to a committee of nine people appointed by the governor. I'm just talking specifically, the heat restrictions that exist. You mean on work? Yes. The work restrictions that exist are promulgated by UTMB policies and UTMB personnel, which are not under the supervision of anybody at TTCJ. They're an independent entity and they're a contract entity. Assuming our unit, though, that we do not agree that this is completely in the medical field, what specific discovery order, what would you do to tweak or change the discovery that's been ordered to make it more palatable or appropriate? I don't know exactly what people need as appropriate discoveries in the theory. You would limit it to the events that happened at the Garza unit in 2012 and what the officials knew as to the conditions of the Garza unit and also what kind of care and placement and housing restrictions were provided to incoming inmates at that unit. Does that answer your question? And would it be also whether or not they did have supervisory authority since that's not what you tested? That is not a fact issue, with all due respect, Your Honor. It's clear by not only state law but by his own pleadings and also by case law. Well, I'll say that we didn't accept your argument. If you rejected the argument that medical care is something that security administrators are not qualified to attach judgment on, then certainly you're right in the additional discovery. No, that's not how you would do it. You would say that housing decisions are made in conjunction with medical personnel and it's ultimately an administrative decision that you might have input but it is still maintained in the prison. That would be what you would do. You wouldn't reject that medical decisions should be made by administrators. That's kind of a false way of putting it, I think. Well, certainly the TTCJ administrators would have to consider medical staff input. But in this particular case, it has not been pled that they ever received any medical input because nobody ever saw Mr. Hinojosa. And the law very clearly states there's no constitutional requirement to an incoming physical. If there was such a constitutional requirement, that would be on the basis of the medical, that would be on the shoulders of the medical providers. Do you say that any of the discovery that is taken forth and that has been ordered or anything is specifically onerous to your clients? You talked in detail about numbers of documents and numbers of depositions. Are there particular things that are particularly onerous in the stage that it's been ordered now, and Judge Brangham's order? Yes. It's particularly onerous to ask discovery as to what happened at all 111 units and what was reported to TTCJ administration. The scope of the units, which is what is onerous. And also the requirement that they respond to whether inmates were transported in cool vans or buses. Well, if it was understood that that means the transfer of facilities, not the buses. I think we ought to take a judge of what she wrote, the way we do. It's plain wrong. Yes, Your Honor. I did not read. You seem to be arguing, though, that she actually was talking in that paragraph about transfer of facilities. Is that onerous as well? I believe it would be, Your Honor, because, again, I would say that a decision to transfer someone, if it's alleged to be based on a medical need, would not be within the scope of responsibility of a security administrator in Huntsville at any unit. And I believe I'm out of time. Thank you, Your Honor. All right. Thank you very much. That concludes the hearing for this morning. We'll be at recess until 9 o'clock tomorrow morning.